IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ARNOLDO HERNANDEZ,

    Plaintiff,

    vs.                                            Civ. No. 92-567 SC/WWD

STEVEN L. SHAW and KEVIN SMALL,

    Defendants.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

    1.  THIS MATTER comes before the Court following an evidentiary hearing held on April 1, 1998. The purpose of the hearing was to inquire into the credibility issues raised by various affidavit statements in connection with plaintiff's arrest. Plaintiff proceeded *pro se* at the hearing.

    2.  This is civil rights case. Hernandez alleges that defendants used excessive force during his arrest for trafficking cocaine. At the time of the complaint and at the time of the hearing, plaintiff was serving a sentence following a conviction on these charges.[1]

    3.  In his complaint, Hernandez states that Shaw "started kicking [him] on his spinal core [sic] and ribs without any reason" after a search of his pickup truck. Compl., Facts, ¶ 1. Plaintiff recounts the events as follows:

---

[1] The pending summary judgment motion is filed by both defendants. An earlier summary judgment motion was filed by defendant Shaw alone, and denied primarily on the basis of affidavits submitted by plaintiff. See ##108, 117. At the same time, however, the Court renamed as defendant Agent Kevin Small, who had been previously dismissed from the case because of the possibility that there may have been some confusion of defendants' identities. See Court Order, #114.

[After being handcuffed and thrown on the ground], I was on my side and saw Agent Small coming from the front of the truck with a gun in his hand, and a magazine in his other hand. He called another officer and said, "Look what I got and then he put the magazine in the gun. At that time, officer Steven Shaw came over and starting [sic] kicking me, in my upper back and shoulder area, ribs, kidneys, about six times. I was bleeding from my chin, because I hit it on the ground when he hit me. While he was hitting me, other cops told him to be careful watch out [sic] for his back. At that time, I turned around and saw officer Steven Shaw walking away from me and a few minutes later another officer came and picked me up and officer Small came in front of me and told the other officers to arrest me and to read me my rights[.]   A.Hernandez Aff., ¶ 11.[2]

4. On July 10, 1997, defendants filed a summary judgment motion based on qualified immunity [docket #124],[3] on which ruling was deferred pending an evidentiary hearing. Given the evidence and testimony submitted at this hearing, I make the following findings of fact and conclusions of law. I also conclude that these findings ultimately support the granting of defendants' pending summary judgment motion. For this reason, some of the findings refer to earlier pleadings and exhibits, as noted.

## Findings of Fact

5. Defendant Kevin Small is a Drug Enforcement Administration ("DEA") special agent. Tr. at 61. Defendant Steven L. Shaw is a Lieutenant with the Rio Rancho Department of Public Safety, and at the time of the incident, was assigned to DEA as a Task Force Officer. Tr. at 85.

6. On November 28, 1990, defendants were carrying out a narcotics investigation which involved the DEA Task Force, the New Mexico State Police, and the Eddy County Metro Narcotics Unit. Tr. at 7, 30. Earlier that day, as part of a buy/bust operation, officials had arrested Marcos Sisneros. Tr. at 30. The initial buy was to be followed up with further transactions at

---

[2] See Exhibits to Pltff's Resp. to Mot. for Sum.J. [#105].

[3] Entries to the court file will be cited as appropriate. Pages from the Transcript of Proceedings of the April 1, 1998 hearing are referenced as "Tr. at ___."

Arnoldo Hernandez' residence located in Carlsbad, New Mexico ("Vest Road property"). Tr. at 64, 86. Air surveillance reports indicated that there was a "lot of movement" at the property, and agents had information leading them to believe that there were narcotics on the property. Tr. at 6, 30, 63.

7. Agents went out to the Vest Road property in order to secure the residence and property for a search warrant, and to conduct a search for further narcotics. Tr. at 63, 80. There was a sense of urgency because of the fact that Marcos Sisneros' arrest took longer than usual and this increased the risk of evidence being destroyed and suspects leaving the area. Tr. at 6, 26, 30, 64. In addition, agents had been informed that an elderly man, Juan Sisneros, Marcos' father, had been left as collateral for the kilo of cocaine that agents had recovered in the buy/bust deal, and they were concerned for his safety. Tr. at 30-31, 39, 63.

8. The ensuing events depict a classic scene of danger and mayhem accompanying the final phases of a narcotics surveillance/investigation operation. In the early afternoon of November 20th, Sgt. Gonzales of the New Mexico State Police, dressed in Marcos' clothing, drove Marcos' pickup truck onto the Vest Road property. Tr. at 5.

9. Several other agents were also riding in the truck, hidden from view. Tr. at 5. Sgt. Keith "K.C." Rogers, also of the New Mexico State Police, was lying on the floorboard of truck, and Agent Small and two other agents were lying in the bed of the truck. Tr. at 9. Rogers and Small were wearing attire that identified them as law enforcement officers. Tr. at 32-33, 64-65.

10. On entering the property, the agents noticed two other pickup trucks near the rear of the property which were moving toward the exit on the front. Tr. at 9, 34, 65. They got out of Marcos' truck in an attempt to stop the trucks from leaving the property. Tr. at 10, 34-35. Sgt.

3

Gonzales yelled at the driver of one of the pickups, Ruben Hernandez (plaintiff's son), to stop and exit the vehicle. Ruben did so, and was subsequently arrested by Sgt. Gonzales. Tr. at 11. A patdown search revealed a loaded semiautomatic pistol in Ruben's waistband. Tr. at 11-12.

11. Meanwhile, Agents Small and Rogers got in front of the other truck which was being driven by Arnoldo Hernandez and in which Juan Sisneros was sitting on the passenger side. Tr. at 35, 66. Plaintiff was ordered not to move and to get his hands up. Hernandez did not comply. Instead, he started to reach under the driver's seat. Tr. at 35-36, 66-67. At this point, Rogers was standing outside the pickup on the passenger side and Small was standing outside of the driver's side next to Hernandez. Tr. at 37, 68.

12. Rogers tried unsuccessfully to break the window of the passenger side where Juan Sisneros was sitting. Tr. at 37, 67-68. Sisneros had been sitting in the truck, not moving and looking "scared & surprised." Tr. at 37. He was physically unstable and had to be eased out of the truck. Tr. at 41.

13. Hernandez still was not complying with orders to get out, but continued to reach under the seat. Tr. at 37, 66-67. Small then fired a shot with his rifle above the cab of the truck, Tr. at 14, 39, 67, after which plaintiff exited the vehicle. Tr. at 68. A .9 millimeter loaded firearm was eventually recovered from under the driver's seat in the pickup. Tr. at 37, 41, 42, 73.

14. Plaintiff resisted the orders of the officers who were attempting to carry out the arrest and secure him. Although he immediately raised both hands in the air upon exiting the truck, Tr. at 67, he again did not immediately comply with orders by both Small and Rogers to get down on the ground. Tr. at 43, 70. Instead, he started yelling in Spanish to someone behind Small whom Small could not see. Tr. at 69. At this time, Rogers was securing Juan Sisneros. Tr. at 40.

15.  Plaintiff posed an immediate threat to the arresting officers and other agents on the scene, and immediate self-protective actions by the arresting officers were necessary.  Tr. at 14, 38-39, 69, 45, 46.

16.  After half a minute, Hernandez still was not on the ground, but continued yelling to someone Small could neither see nor identify.  Tr. at 41, 70.  As Hernandez finally started going down to the ground, Small raised his foot on plaintiff's lower back to push him down and keep him there.  Tr. at 14, 70.[4]

17.  Small kept his gun trained on Hernandez during this time, as plaintiff had not yet been patted down for weapons.  Tr. at 69.  Defendant Small kept his foot on the small of plaintiff's back to prevent him from moving.

18.  Both Sisneros and Hernandez were kept on the ground for about a minute until they were handcuffed and then brought back to a standing position.  Tr. at 44, 46.  Plaintiff was then searched for weapons.  Tr. at 44, 73.

19.  Plaintiff's allegations of being handcuffed first, then thrown on the ground and beaten, is contradicted by all other evidence and testimony, and is therefore not credible.  Although there is some slight confusion over who handcuffed plaintiff, accounts agree as to both plaintiff and Juan Sisneros being handcuffed while on the ground and before standing up.  Tr. at 44, 73-73.  Hernandez was then walked back to the pickup truck and left leaning against the side along with the other arrestees.  Tr. at 46, 75.

---

[4] In his testimony, plaintiff stated that he tried to lift his knee up to "get the pressure off his back."  Tr. at 110.

20. Defendant Shaw neither participated nor witnessed the events leading up to or during the arrest. He first arrived at the scene after plaintiff was arrested and brought back to remain standing at the side of the truck. Tr. at 17, 48, 72, 88.

21. Shaw, who had been used in undercover capacity, was not in protective clothing nor dressed in a way which would identify him as law enforcement. He basically entered the premised after the arrests were effected in order to watch the main house in the front of the property. Tr. at 87.

22. Agent Shaw did not kick, hit or beat Arnoldo Hernandez. Tr. at 15, 49, 82, 89, 92. In fact, Shaw had no physical contact with defendant before, during or after the arrest. Tr. at 14, 19, 21, 23-24, 49, 51, 89, 92.

23. Defendant Shaw requested that plaintiff be advised of his Miranda rights in both English and Spanish. Tr. at 19-20, 48, 89. Shaw next saw plaintiff the following day when he and another officer transported plaintiff and his son Ruben from Carlsbad to the Bernalillo County Detention Center ("BCDC") in Albuquerque. Tr. at 91, 95.

24. Law enforcement officers are required by procedure to contact medical emergency when a suspect is hurt or complains of an injury. Tr. at 22, 23, 83-84, 91.

25. After his arrest, and the following morning when he was transported to BCDC, Hernandez did not complain of pain or injury, express discomfort, or request medical attention. Tr. at 21, 24, 52, 74, 84, 91.

26. Plaintiff showed no evidence of any injury and did not require medical attention. Tr. at 47, 52, 74, 83-84, 90; see also Exs. D, E to Mart. Rep. [#103] (booking photo and post-arrest medical assessment).

27.   According to standard policy, Hernandez would not have been accepted for incarceration at any detention facility had he been injured or required medical attention.  Tr. at 23, 83, 93.

28.   Plaintiff was transported to the Eddy County Detention Center following the arrest without the need for medical attention.  Tr. at 23-24, 54, 93-94.

29. Defendants' version of the incident is the more credible account of events and is supported by testimony and evidence that is consistent with the material facts and issues.  The existence of minor inconsistencies, pointed out by plaintiff, are not relevant either to the time frame in question or to the question of the reasonableness of the force used during the arrest.[5]

30.   On the other hand, portions of testimony by both plaintiff and his son Ruben are inconsistent with allegations of excessive force by either defendant.  At the least, their testimony indicates some confusion on the central issues.  For example, although Hernandez identified defendant Shaw in the Complaint as the individual who kicked him repeatedly, his testimony and proffered evidence actually does not contradict defendants' position that Shaw did not arrive on the scene until after the arrest and the alleged incidents had occurred.

31.   Also, in an earlier affidavit, Ruben Hernandez' referred only to an unidentified "gentleman" who walked over to plaintiff and "frequently kicked him in his back."  See Aff. R.

---

[5] For example, whether or not plaintiff was in fact escorted to the bathroom is not relevant to the underlying allegations when even plaintiff's account places the time as after the arrest and after he was standing for a while at the side of the truck. Tr. at 113. Defendants contend that he was never taken into the house at all. Tr. at 22, 50. Similarly, although affidavits by members of plaintiff's family attest to the fact that plaintiff's chin was bleeding after the arrest, the only family member who was present during the arrest was Ruben. There is otherwise no evidence at all to connect this alleged injury either with defendant Shaw, or with defendant's use of excessive force in making the arrest. In fact, the evidence is to the contrary.

7

Hernandez, Ex. to Pltff's Resp. to Mot. for Sum.J. [#105].   Further, Ruben's testimony at the hearing offers nothing in the way of support for plaintiff's allegations against either defendant.  The questions which plaintiff asked his son on direct examination and Ruben's responses do not indicate that either defendant used excessive force, or that Shaw was even present at the time:

> Q: [Pltff] Was there some person that you saw - - who saw Mr. Kevin Small kick me in the back with his foot?
>     Objection. Calls for hearsay. . .
> A: [Ruben Hernandez] I seen a man, we were laying down together, they had arrested me, they put us together side by side, right next to the pickup.  I seen a man kick you in the back.
> Q: Did you at some time see Agent Kevin Small beat me on my back?
> A: I seen a man kick you in your back.

Tr. at 100.

32.   It is not clear whether plaintiff intentionally decided to eliminate Shaw from the scenario or whether he was confused as to the defendants' respective identities.  Ultimately, however, plaintiff's allegation that Small held him down on the ground while "another officer" (identified as Shaw in his Complaint) came up and started kicking him in the back is not credible, in light of all the other evidence submitted in this case.  Tr. at 110.

## Conclusions of Law

33.   To succeed on a complaint brought pursuant to 42 U.S.C. § 1983, a plaintiff must allege some personal involvement by the defendant in the constitutional violation.  Meade v. Grubbs, 841 F.2d 1512, 1527-27 (10th Cir. 1988) (affirmative link must be established between alleged constitutional deprivation and any conduct by defendant).

8

34. Plaintiff has failed to demonstrate any personal involvement by defendant Shaw in the alleged constitutional violation. The claim against Steven Shaw, therefore, is not cognizable under § 1983 and should be dismissed with prejudice.

35. Because defendants have adequately raised the defense of qualified immunity in their summary judgment motion, plaintiff must show that the law was clearly established when the alleged violation occurred and come forward with facts or allegations sufficient to show that the official(s) violated clearly established law. Clanton v. Cooper, 129 F.3d 1147 (10th Cir.1997).

36. In this case, plaintiff's statements in the Complaint set forth facts, which, if true, state a viable claim for excessive force under the Fourth Amendment. Thompson v. City of Lawrence, Kan., 58 F.3d 1511, 1516 (10th Cir. 1995) (seizure must be objectively reasonable in light of the surrounding facts and circumstances); see ¶ 3, above.

37. It should also be clear from the legal standard set out above that at the time of the November 1990 incident, the law was clearly established that a claim of excessive force by officers in the course of an arrest should be analyzed under the Fourth Amendment and its standard of objective reasonableness under the circumstances. Graham v. Connor, 490 U.S. 386, 394 (1989).

38. Factors employed to determine reasonableness are the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. Tennessee v. Garner, 471 U.S. 1, 8-9 (1985); Zuchel v. Spinharney et al, 890 F.2d 273, 274 (10th Cir. 1989); accord, Wilson v. Meeks, 52 F.3d 1547, 1553 (10th Cir.1995).

39. The use of force must be judged from the perspective of a reasonable officer "on the scene," who is "often forced to make split-second judgments . . . about the amount of force that is

necessary in a particular situation." Graham, 490 U.S. at 396-97; see Latta v. Keryte, 118 F.3d 693, 701 (10th Cir. 1997) (reasonableness of particular use of force must be judged from the perspective of a reasonable officer on the scene, "rather than with the 20/20 vision of hindsight . . . ").[6]

40. Plaintiff's refusal to comply with the orders of the law enforcement officers increased the risk of danger to defendant Small and other law enforcement officers on the scene.

41. In order to prevail on their summary judgment motion, defendant Small[7] must show that no material issues of fact remain as to whether his actions were "objectively reasonable" in light of the law and the information he possessed at the time. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

42. Defendant Small used only force that was necessary to push plaintiff to the ground and keep him there when he tried to move or change positions, in order to secure plaintiff and protect himself and other law enforcement officials from harm. Thus, he has adequately shown that no genuine dispute of material fact exists as to the objective reasonableness of his conduct.

43. Any finding of fact that is more appropriately a conclusion of law shall be deemed a conclusion of law. Any conclusion of law that is more appropriately a finding of fact shall be deemed a finding of fact.

---

[6] Thus, plaintiff's old back injury which may have become reinjured or caused him pain is not critical or relevant to whether reasonable force was used. Tr. at 110; see also Ex. to Pltff's Resp. to Mot. for Sum.J.[#105] (undated presentence report at 10-11).

[7] I refer only to defendant Small here based on my finding that defendant Shaw had no connection to the alleged incidents.

**Recommendation**

I recommend: (1) that all claims against defendant Shaw be dismissed with prejudice based on plaintiff's failure to demonstrate any personal involvement by defendant Shaw in the underlying incidents which form the basis for the alleged constitutional violation; (2) that all claims against defendant Small be dismissed with prejudice, based on the objective reasonableness of his actions before and during the arrest; and (3) that defendants' motion for summary judgment based on qualified immunity [124-1] be granted and that this cause be dismissed with prejudice in its entirety.

Within ten days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such proposed findings and recommendations.  A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

_____
UNITED STATES MAGISTRATE JUDGE